NELSON *v.* BIG RAPIDS GAS CO.

1. APPEAL AND ERROR—CHANCERY CASES REVIEWED DE NOVO.
   Chancery cases are considered *de novo.*

2. CONTRACTS—CONSTRUCTION—OIL AND GAS RESERVES ''ON OR UNDER'' LAND.
   In the interpretation of words ''on or under'' as used in contract for supply of natural gas from plaintiff's leasehold, Supreme Court is guided by established rules of construction of contracts and by the intention of the parties as indicated by the entire contract and surrounding circumstances where term is not shown to have been judicially construed as applied to oil or gas reserves.

3. SAME—CONSTRUCTION—INTENT.
   Intention of parties in making contract should be ascertained by construing it in the light of circumstances existing at the time it was made and not subsequent changed circumstances and events, and manifest intent must prevail over the literal sense of terms.

4. GAS—PRODUCTION—RECOVERY.
   Gas produced is the same as gas recovered from a leasehold.

5. SAME—DEFINITION OF ''RESERVES.''
   In the oil and gas industry, the term ''reserves'' is generally accepted to mean the amount of oil and gas that can be produced and recovered from a certain tract of land.

---

Interpretation of contracts, see 1 Restatement, Contracts, §§ 230–236.

6. SAME—RESERVES ON OR UNDER LAND.

In construing portion of contract relating to amount of natural gas purchaser was required to purchase from plaintiff in course of 10 years wherein it was provided that purchaser should take such of its requirements as the ''estimated reserves * * * on or under'' the tract should be reasonably sufficient to provide a source of supply for and during a 10-year period, parties *held,* to have intended to mean the reserves of natural gas that could be produced and recovered over a period of 10 years from one or more wells drilled on the land rather than amount in place at time of beginning of contract.

7. SAME—CONTRACTS—RESERVES—ARBITRATION.

A court will not interfere and interpose its determination as to amount of gas reserves on or under a tract of land when such question arises in a proceeding to recover sums from purchaser pursuant to contract which itself provides a method for making such determination in case the parties are unable to agree; hence action of court in rejecting report of geologist, appointed by public utilities commission pursuant to contract, and taking of further testimony regarding reserves and condition of leasehold and gas well thereon was erroneous.

8. APPEAL AND ERROR—CHANCERY—DE NOVO REVIEW—SET-OFF.

On appeal in chancery case, issues regarding set-offs claimed by defendant are disposed of in order to conclude protracted litigation, since the appeal is considered *de novo.*

9. GAS—ESTIMATED RESERVES—CONTRACTS—MAXIMUM RECOVERY.

Under decree ordering defendant to pay for natural gas it had taken, not exceeding reserves for period gas was taken as estimated pursuant to method provided in contract relative to purchase of gas, where defendant's take was in excess of amount of reserve so estimated the estimated reserve was the maximum amount for which recovery could be had by plaintiff.

10. SAME—SET-OFF—PRORATION ORDER.

Defendant purchaser of natural gas was not entitled to credit for amount plaintiff producer had sold to others after proration order of public utilities commission was issued in order to mitigate damages against amount plaintiff was entitled to recover from defendant for gas taken by latter prior to such proration order.

11. APPEAL AND ERROR—SPECIFIC PERFORMANCE—NATURAL GAS—SET-OFF—COST OF WELL.

In suit for specific performance of contract relative to purchase of natural gas in which defendant was required to furnish all

material and labor necessary to drill and complete a gas well, defendant was not entitled to set off against plaintiff's recovery the cost of such material and labor where it appears from record that the major part of the cost of the well was paid by plaintiff, not defendant.

12. INTEREST—ENTRY OF DECREE—PAYMENT.
   On petition for determination of sum due under decree for specific performance of contract relative to purchase of natural gas, plaintiff is entitled to recover interest at five per cent. on sum found due from date decree is entered until payment thereof.

Appeal from Muskegon; Sanford (Joseph F.), J. Submitted August 26, 1941. (Calendar No. 41,663.) Decided October 6, 1941.

Petition by Hjalmar C. Nelson against Big Rapids Gas Company, a Michigan corporation, for determination of amount due plaintiff under decree. Plaintiff reviews order dismissing petition by appeal in the nature of mandamus. Reversed.

*Alexis J. Rogoski,* for plaintiff.

*Worcester & Worcester* and *Warner, Norcross & Judd,* for defendant.

STARR, J. Plaintiff appeals from an order entered by the circuit judge, February 11, 1941, dismissing plaintiff's petition filed May 10, 1938, for determination of amount due plaintiff from defendant under decree of this court entered December 28, 1936. This being a chancery case, we consider the same *de novo* and will endeavor to dispose finally of the prolonged litigation between these parties.

Our former decision in this case (*Nelson* v. *Galpin,* 277 Mich. 529) and our decree entered December 28, 1936, should be reviewed and considered as

prefatory to this opinion. We will herein refer to the case of *Nelson* v. *Galpin, supra,* as the "first case" and the appeal now before us as the "present case."

Our decree entered in pursuance of opinion in the first case provided in part as follows:

"(Paragraph 2)   That the defendant, Big Rapids Gas Company, is liable for the performance of the obligations of the party of the second part in the contract, dated May 20, 1933, wherein plaintiff is party of the first part, and Harris E. Galpin, Trustee, is party of the second part.

"(Paragraph 3)   That defendant, Big Rapids Gas Company, shall account to plaintiff for all gas used by it between May 20, 1933, and the date hereof, shall forthwith deliver to plaintiff a verified statement of all natural gas used by it between said dates, and shall immediately make payment to plaintiff at the rate of 15 cents per 1,000 cubic feet for all natural gas used by it between May 20, 1933, and March 22, 1935, not in excess, however, of the amount of his reserve for such period, determined as stipulated by paragraph 5 of the contract between the parties.

"(Paragraph 4)   That for all gas used by defendant between March 22, 1935 (the date of the first order of the Michigan public utilities commission determining the amount of gas which might be withdrawn daily from plaintiff's well based upon the open flow thereof) and the date hereof, defendant, Big Rapids Gas Company, shall pay to plaintiff at the rate of 15 cents per 1,000 cubic feet for all gas used by it, which under an order or orders of Michigan public utilities commission was subject to withdrawal by plaintiff from his said well.

"(Paragraph 5)   That defendant, Big Rapids Gas Company, shall be entitled to receive credits from plaintiff on the amounts hereinbefore decreed to be paid by the said defendant to plaintiff for

all gas sold by plaintiff from his leasehold between May 20, 1933, and the date hereof.

"(Paragraph 6)   That hereafter defendant, Big Rapids Gas Company, shall take from plaintiff's leasehold, all gas required by it for the remainder of the term of said contract, to the extent that orders from time to time made by Michigan public utilities commission will permit plaintiff to supply to defendant, Big Rapids Gas Company, its said requirements for natural gas, and said defendant shall pay to plaintiff therefor in the manner and at the times, and at the rate prescribed by paragraph 9 of said contract; or, in the alternative, for the remainder of said term of said contract, defendant, Big Rapids Gas Company, between the 5th and 25th days of each month hereafter, shall account to plaintiff for all natural gas used by it during the preceding month, and on the 25th day of each month shall pay to plaintiff the equivalent of the amount of gas used by it for said preceding month that was subject to withdrawal from plaintiff's well or wells pursuant to such order or orders of Michigan public utilities commission, at the rates prescribed by paragraph 9 of said contract, less the amount received by plaintiff during said preceding month for any gas sold by him from his leasehold not in excess of the amount of his reserve, determined in the manner and stipulated in the provisions of paragraph 5 of said contract; and it shall be the duty of plaintiff to apprise said defendant, Big Rapids Gas Company, in writing, prior to the 25th day of each month, of all sums received by him for the sale of gas during the preceding month from said leasehold not in excess of the reserve for the preceding month. * * *

"(Paragraph 9)   That this cause be, and it is hereby remanded to the circuit court for the county of Muskegon, in chancery, for the accounting required hereby, and that said court shall thereafter retain jurisdiction of this cause for the purpose

herein mentioned, and for the other purposes stated in paragraph 7 of the decree entered below.''

Paragraph 5 of the contract between the parties, dated May 20, 1933, and referred to in our decree, reads as follows:

''Second party shall only be required to purchase from said first party such of its requirements for said gas as the *estimated reserves* for said gas, as hereinafter determined, *on or under* said tract of land shall be sufficient to reasonably provide a source of supply to second party of its requirements for and during the period of 10 years from and after sale of said gas shall be commenced by first party to second party; it being intended that second party shall not be required in the purchase of gas from first party to take or purchase such quantity of gas as would deplete said acreage of its said reserves sooner than 10 years' time. In the event said reserves shall be in excess of said requirements over said period of time, said second party agrees that first party may sell to other parties such gas as shall not be required by said second party hereunder but in no event shall said reserves be depleted faster than said estimated requirements or at a rate sooner than to preserve the same for said period of 10 years. The amount of said reserves shall be determined from time to time by agreement between the parties hereto and in the event said parties are not able to agree said reserves shall be estimated and determined by a geologist of recognized standing to be appointed by the Michigan public utilities commission of the State of Michigan or its successor then in office upon the application of either party.''

The parties were unable to agree on the amount of natural gas reserves ''on or under'' plaintiff's 80-acre leasehold. On plaintiff's application the circuit judge entered an order February 14, 1938,

providing in part that the gas reserves of plaintiff's leasehold "shall be estimated and determined for the period of 10 years commencing January 1, 1934, by a geologist of recognized standing to be appointed by the public utilities commission of the State of Michigan, in keeping with paragraph 5 of the contract dated May 20, 1933."

On February 25, 1938, the Michigan public utilities commission entered order providing in part:

"(a) That said applicant [plaintiff] and the Big Rapids Gas Company are unable to agree as to the amount of applicant's reserve of natural gas. * * *

"(d) That Ralph W. Melhorn, of 720 North Washington street, Owosso, Michigan, is a geologist of recognized standing and is a proper person to be appointed by this commission for the purposes indicated in this order.

"Now, therefore, it is hereby ordered—

"1. That Ralph W. Melhorn of Owosso, Michigan, be and he is hereby appointed as a geologist to make an estimate and determination of the gas reserve on or under the tract of land situate in the county of Mecosta, State of Michigan, described as follows, to-wit: South ½ of the northwest ¼ of section 11, town 14 north, range 9 west, containing 80 acres, more or less, in accordance with the terms of the said contract of May 20, 1933, and the said order of the circuit court for the county of Muskegon in chancery, dated February 14, 1938."

Under date of April 9, 1938, geologist Melhorn made his report and estimate of gas reserves *under or applicable to* plaintiff's leasehold, which report read as follows:

"This certifies that I, Ralph W. Melhorn, an accredited oil and gas geologist residing at 720 North Washington street, Owosso, Michigan, was appointed on March 4, 1938, by order of the Michigan

public utilities commission to estimate the gas reserves under (or applicable to) the Spitler 80-acre farm [plaintiff's leasehold] situated in the south ½ of the northwest ¼ of section 11, township 14 north, range 9 west, in what is known as the Austin township gas field; that the order further directs that an estimate of such gas reserves be made for a period of 10 years beginning January 1, 1934.

"I further certify that I have studied all court testimony and have read many letters bearing upon the Spitler lease, and upon the gas well drilled October 18, 1933, upon this lease: that I have secured all available data from the files of the Michigan public utilities commission which bears upon the Spitler well and upon all wells in the Austin gas field; that I have carefully studied all of these records, and that I have incorporated my conclusions in a detailed report which is appended herein; that I have based my conclusions solely upon the actual recoveries from the Austin field and not upon any technical formula or method; that I have formed these conclusions with no collaboration or consultation with any individual or individuals.

"I hereby certify that, in my belief, the Spitler well, if it had been turned into a distribution line on January 1, 1934, and allowed to produce up to 17½ per cent. of its daily open flow, would produce, over a period of 10 years, which I have taken as the life of the well, a total of 1,000,000,000 cubic feet of gas; that the life span of 10 years assumes each year a removal of a proportionate part of the 1,000,000,000 cubic feet total, and that the well be kept in good mechanical condition in accordance with good field practices."

On May 10, 1938, plaintiff filed petition in circuit court showing the Melhorn estimate and determination of gas reserves for plaintiff's leasehold and requesting determination of the amount due plaintiff, under the contract and former decree of this court,

for the period from May 20, 1933, to March 22, 1935. Defendant company filed answer to such petition challenging the report by geologist Melhorn on the ground that his estimate and determination of gas reserves were not made in accordance with paragraph 5 (above quoted) of the contract and the decree of this court.

From the record it appears that plaintiff makes no claim as to gas used by defendant between March 22, 1935, and December 28, 1936, the date of our decree, as during such period plaintiff, to mitigate his damages, sold to the American Michigan Pipe Line Company, under proration orders of the Michigan public utilities commission, an amount of gas exceeding the estimated reserves for such period, for which defendant would be liable under the contract.

No action was taken on plaintiff's petition of May, 10, 1938; and on March 17, 1939, defendant filed petition to take additional testimony regarding the gas reserves determined by the Melhorn report and regarding the condition of the gas well on plaintiff's leasehold. Plaintiff's counsel opposed such petition and the taking of additional testimony, on the ground that a determination of gas reserves "on or under" plaintiff's leasehold had been made by a geologist appointed by the public utilities commission in accordance with the contract and that under the decree of this court the taking of additional testimony regarding gas reserves was not permissible. Plaintiff's objections being overruled, order was entered April 18, 1939, granting defendant's petition. On August 2, 1939, defendant began the taking of additional testimony. Only one witness was sworn, who testified regarding the condition of plaintiff's leasehold and the gas reserves of such leasehold.

There was no decision on plaintiff's petition of May 10, 1938, until January 3, 1941, when the cir-

cuit judge filed opinion, followed by decree on February 11, 1941, denying such petition. We quote the pertinent parts of the circuit judge's opinion as follows:

"This cause is now before the court as a result of the decree of the Supreme Court remanding the same to this court for further proceedings consistent with the opinion and decree of the Supreme Court. The original trial of this case was before the late Judge Vanderwerp. His decree was appealed by the defendant, Big Rapids Gas Company, to the Supreme Court, and there was affirmed in part and reversed in part. * * *

"On October 18, 1933, a productive gas well was drilled in on the Nelson 80-acre leasehold. On November 13, 1933, control of the Big Rapids Gas Company passed to the two Taggart brothers. In January, 1934, the gas company began to use natural gas in place of manufactured gas. *This natural gas came from the Austin natural gas field, from wells controlled by the Taggart brothers. No gas for the Big Rapids Gas Company was taken from the Nelson well.* This situation continued until March 22, 1935, when proration was applied to the Austin natural gas field under orders of the Michigan public utilities commission. * * *

"On the application of the plaintiff, the Michigan public utilities commission entered an order on February 25, 1938, appointing Ralph W. Melhorn as the geologist. This order directed Mr. Melhorn to make an estimate and determination of the gas reserves 'on or under' the Nelson 80-acre leasehold in accordance with paragraph 5 of the Nelson-Galpin, Trustee, contract.

"Some time subsequently Mr. Melhorn filed a report in this case. On page 14 of this report Mr. Melhorn expressly stated that his estimate and determination was not of the reserves originally '*on or under*' the Nelson 80-acre leasehold but was of the reserves '*applicable to*' the Nelson well. On

reading the report it is clear that in the reserves 'applicable to' the Nelson well, Mr. Melhorn included gas originally under other people's acreage in the Austin natural gas field as well as that originally under the Nelson 80-acre leasehold itself. The total reserves 'applicable to' the Nelson well were estimated at 1,000,000,000 cubic feet.

"After Mr. Melhorn's report was filed, plaintiff filed a petition in this case praying in effect that the court accept the Melhorn report as a basis for determination of the liability of the gas company to the plaintiff. To this petition the gas company filed an answer objecting to the Melhorn report on the ground that the report was a violation of the order of this court of February 14, 1938, and of the order of the Michigan public utilities commission of February 25, 1938, and was not in accordance with paragraph 5 of the Nelson-Galpin, Trustee, contract. The objection was that the report did not estimate and determine the reserves of gas originally 'on or under' the Nelson 80-acre leasehold, but instead made an estimate and determination which included gas originally under other people's acreage as well as that originally under the Nelson 80-acre leasehold.

"The matter presently before the court is on this petition and answer. The issue is whether to accept or reject the Melhorn report.

"In the case at bar the liability of the defendant, Big Rapids Gas Company, to the plaintiff is the result of the Nelson-Galpin, Trustee, contract, and nothing else. Hence, we must look to that contract for the provisions governing the amount and limit of such liability. Paragraph 4 of that contract obligated the gas company to take all of its requirements of natural gas from the Nelson well. But this obligation was qualified by paragraph 5 of the contract which limited the obligation to taking no more per year than 1/10 of the reserves of gas originally 'on or under' the Nelson 80-acre leasehold.

"To the court, the words 'on or under' in paragraph 5 of the Nelson-Galpin, Trustee, contract are absolutely controlling in this case. They mean the reserves of gas originally underneath the Nelson 80-acre leasehold. Gas originally underneath other people's acreage in the Austin natural gas field is not to be included in the reserves specified in paragraph 5 of the Nelson-Galpin, Trustee, contract.
\*   \*   \*

"The court, therefore, holds that the Melhorn report must be rejected because not in compliance with paragraph 5 of the Nelson-Galpin, Trustee, contract.

"Other contentions made by counsel for plaintiff may just as well be stated and answered.

"Counsel for plaintiff argues that the Melhorn report is in the form required by the order of this court of February 14, 1938. This is not true. The order of the court required the geologist's report to conclude substantially in manner and form as follows:

"'The undersigned has estimated and determined the natural gas reserve *on or under* the leasehold of Hjalmar C. Nelson.' \* \* \*

"Instead of this, the Melhorn report, on page 14, expressly negatives that it is a determination of the reserves on or under the Nelson 80-acre leasehold.
\*   \*   \*

"In rejecting the Melhorn report, the court is merely exercising its judicial function of construing paragraph 5 of the Nelson-Galpin, Trustee, contract. Such construction of paragraph 5 is a question of law for the court to decide, and not for the geologists. It is the decision of the court as a matter of law that the Melhorn report is not in compliance with paragraph 5 of the Nelson-Galpin, Trustee, contract.

"An order will therefore be entered denying the plaintiff's petition to accept the Melhorn report. This will be without prejudice to the appointment of another geologist by the Michigan public service commission (successor to the Michigan public

utilities commission), under the previous order of this court on February 14, 1938, which is still in effect. Further proceedings will await the filing of a report by such other geologist as to the reserves of natural gas originally underneath the Nelson 80-acre leasehold. This is because no determination of the amount of the liability of the gas company to the plaintiff for the period January 1, 1934, to March 22, 1935, can be made until there is in existence an estimate and determination of the reserves of gas originally underneath the Nelson 80-acre leasehold in accordance with paragraph 5 of the Nelson-Galpin, Trustee, contract."

On May 21, 1941, we granted leave to appeal from the circuit court order of February 11, 1941.

The principal question on this appeal is, what interpretation shall be placed on the words "estimated *reserves* for said gas * * * *on or under*" plaintiff's leasehold, appearing in paragraph 5 (above quoted) of the contract of the parties.

In his report geologist Melhorn bases his estimate and determination of the natural gas reserves for plaintiff's leasehold on the amount of gas recoverable from the leasehold. Plaintiff's counsel contend that the words "reserves * * * *on or under*" mean the amount of gas that can be produced and recovered, and that the Melhorn estimate and determination were properly made in accordance with paragraph 5 of the contract and is binding upon the parties.

Defendant's counsel argue that the words *"reserves * * * on or under"* mean the fixed volume of natural gas in place and originally located directly underneath plaintiff's leasehold. Defendant's counsel claim that the Melhorn estimate and determination of gas reserves, based on gas recoverable, was not made in accordance with the contract.

To state the question in another way, do the words "reserves * * * *on or under*," as used in the

contract, mean the amount of gas that may be produced and recovered from well or wells drilled on plaintiff's leasehold, or do they mean the volume of gas which, on January 1, 1934, was confined directly underneath the leasehold within a space outlined by the downward-projected sidelines of the tract?

Our attention has not been called to any court interpretation of this phrase "on or under" as applied to oil or gas reserves. Therefore, in our interpretation of these words we must be guided by established rules of construction of contracts and by the intention of the parties as indicated by the entire contract and surrounding circumstances. In *Montgomery* v. *Central Bank & Trust Co. of Battle Creek,* 267 Mich. 142, 144, 145, this court said:

"There are certain cardinal rules of construction with which courts are in agreement.

" 'Every deed or contract in writing is supposed to express the intention of the parties executing it, and when the object or purpose of such deed or contract is called in question in a court of justice the first inquiry is, what is the intention of the parties, as expressed in the written instrument?' *Bassett* v. *Budlong,* 77 Mich. 338, 346 (18 Am. St. Rep. 404).

" To ascertain such intent, it 'should be construed in the light of the circumstances existing at the time it was made.' *Kellogg* v. *Kellogg Toasted Corn Flake Co.,* 212 Mich. 95, 114. In doing so, we 'must look to the purpose sought to be accomplished,' *Hess* v. *Haas,* 230 Mich. 646, 651, and 'uphold, and enforce the rights and duties that spring from the real intention of the parties.' 21 C. J. p. 204. Its 'manifest intent must prevail over the literal sense of terms.' *Township of Stambaugh* v. *Iron County Treasurer,* 153 Mich. 104, 107.

" 'And in order that the court may see just how the transaction came about and received the

shape it actually bears, a reference is proper to the surrounding facts. * * * There is no requirement to adhere to the literal terms in derogation of the interior sense of the transaction.' *Stuart* v. *Worden,* 42 Mich. 154, 160.''

See, also, *Moore* v. *Kimball,* 291 Mich. 455; *Edison Sault Electric Co.* v. *Manistique Pulp & Paper Co.,* 278 Mich. 592; *McIntosh* v. *Groomes,* 227 Mich. 215; *Biltmore Land Co.* v. *Estate of Munro,* 271 Mich. 125; *Detroit Trust Co.* v. *Manilow,* 272 Mich 211; *Quisle* v. *Brezner,* 212 Mich. 254; *Brown* v. *A. F. Bartlett & Co.,* 201 Mich. 268; *Ardis* v. *Railway Co.,* 200 Mich. 400; *Concord Oil & Gas Co.* v. *Thompson,* 248 Mich. 230.

To determine the intention of plaintiff and defendant it is necessary to examine their situation prior to and on May 20, 1933, when this contract was made. Changing circumstances and events subsequent to the execution of the contract are not controlling factors in determining such intention. The situation of the parties was well explained in our opinion in the first case:

''In the instant case Tippy wanted natural gas for distribution to the customers of the corporation in Big Rapids. With these customers becoming, as it were, 'natural gas conscious,' and with a competitor seeking a franchise to bring natural gas into the city of Big Rapids for distribution, Tippy, as president of the Big Rapids Gas Company, was desperately striving to secure natural gas to satisfy the desires of his customers, and to stave off the approachments of intendant competitors. The very business life of his corporation depended upon the obtaining by it of natural gas. Then came the apparent opportunity for Tippy to obtain natural gas from the land under lease by plaintiff. * * *

"Mr. Welsh, a witness for plaintiff, testified to statements made at that time by Tippy, as follows:

"'He stated he anticipated competition with Taggart Brothers. He mentioned the fact that he thought they would get a line into Big Rapids because they would not sell gas to him, and that they were determined to have the Big Rapids Gas Company themselves for a source of income.' * * *

"It must be remembered that appellant was in dire need of securing natural gas for its customers in Big Rapids; that it apparently faced business extinction if it did not secure it; that a competitor, Taggart Brothers, was attempting to supplant it in its territory, and had for that purpose piped natural gas to the very gates of the city; that Taggart Brothers, a common purchaser of gas, had refused to sell it gas of theirs; that no other gas was then available for it; that when the opportunity was presented by plaintiff whereby such supply of gas could be obtained, it was avidly seized upon by appellant as the panacea of its business difficulties. Appellant wanted natural gas and must have enough to supply its demands. Nowhere else was gas found available. It agreed to take it from plaintiff and in amounts sufficient to meet its requirements. * * *

"At the time of the making of the contract, the volume of the flow of natural gas to be produced from plaintiff's leasehold was unknown. By the very terms of the contract more than one well was contemplated as essential to produce the gas necessary for appellant's requirements." *Nelson* v. *Galpin, supra,* 536, 543, 544.

We cannot overlook the fact that Taggart Brothers owned or controlled many producing natural gas wells in the Austin field, in which plaintiff's leasehold was located, and that soon after the contract in question was executed, Taggart Brothers acquired a controlling stock interest in defendant company. Quite naturally Taggart Brothers there-

after preferred to sell gas from their own wells to defendant company, which they controlled, rather than have defendant purchase gas from plaintiff's leasehold under the contract. Taggart Brothers' acquiring control of defendant company after the contract in question was made may account for defendant's efforts to escape liability to plaintiff on such contract throughout the six or more years of litigation.

It is clear that, when this contract was signed on May 20, 1933, the parties were interested in how much natural gas could be produced and recovered from plaintiff's 80-acre leasehold. Plaintiff wanted to sell, and defendant needed, and wanted to purchase, its requirements of natural gas. The parties indicated their intention in paragraph 4 of the contract, which provides in part:

"Upon the completion of said well or wells as above set forth, first party agrees to sell and the second party agrees to purchase from and out of all *natural gas produced* by first party from said land and leasehold all of the requirements of said second party for the sale and distribution of natural gas."

Gas produced is the same as gas recovered from the leasehold; and when the parties contracted in paragraph 4 as to "gas produced," it is reasonable to assume that in succeeding paragraph 5 they were contemplating gas reserves which could be produced and recovered. Their intention is further indicated by paragraph 5, where the phrase "provide a source of *supply* to second party of its *requirements* for and during the period of 10 years" is used. By contracting for a "supply" and "requirements" of gas, the parties clearly contemplated gas to be produced and recovered from plaintiff's leasehold.

When the parties provided in their contract for an estimate and determination of the reserves of

natural gas "on or under" plaintiff's leasehold, they were endeavoring to ascertain how much gas would be produced and available for defendant's use over the 10-year period. An estimate made on the basis of defendant's theory of the volume of gas located in place and fixed position directly underneath plaintiff's leasehold on January 1, 1934, would have afforded the parties no guide or criterion as to future recovery, because natural gas is fugitive, transitory, always seeking avenues of escape. There is no way of ascertaining how much of the gas that comes out of a well was located in fixed position, *in situ,* under the acreage of land on which the well is located. Natural gas may be in placement under land today and be gone tomorrow, by reason of changing gas or water pressures or other causes.

In the oil and gas industry the term "reserves" is, we believe, generally accepted to mean the amount of oil and gas that can be produced and recovered from a certain tract of land.

We are convinced that the parties intended the words "reserves * * * on or under," as used in paragraph 5 of their contract, to mean the reserves of natural gas that could be produced and recovered over a period of 10 years from one or more wells drilled on the land. In the first case we said:

"Paragraph 5 of the contract provides that the amount of reserves shall be determined by agreement between the parties, and in the event of inability to agree, for the appointment of a geologist to make such determination. The parties are bound by the terms of their contract, and we will not here interfere and interpose our determination of the amount of reserves for. the method called for by the contract." *Nelson* v. *Galpin, supra,* 547.

There seems to be no question raised as to the integrity, ability, and good faith of geologist Mel-

horn, who was appointed by the public utilities commission in pursuance of the contract between the parties and the order of the circuit court. We, therefore, conclude that the Melhorn estimate and determination of the natural gas reserves "on or under" plaintiff's leasehold, as set forth in the Melhorn report of April 9, 1938, were properly made under paragraph 5 of the contract, and the parties are bound by such estimate and determination. The lower court was in error in rejecting the Melhorn report and in permitting the taking of further testimony regarding gas reserves and the condition of plaintiff's leasehold and gas well thereon.

Counsel raise certain issues regarding set-offs claimed by defendant; and, as this is a chancery appeal considered *de novo,* we will dispose of such issues in order to conclude this litigation.

It appears that in the year 1934 defendant company used 100,873,600 cubic feet of gas and, therefore, is obligated to plaintiff for the estimated reserves of 100,000,000 cubic feet for such year period at the rate of 15 cents per 1,000 cubic feet.

During the period from January 1 to March 22, 1935, defendant, as shown by its reports, used 72,799,655 cubic feet of gas. Plaintiff contends that defendant is liable for the full amount of gas it used during such period of 2-22/31 months, because such amount did not exceed the estimated reserves of 100,000,000 cubic feet for the full year of 1935. Defendant contends that under paragraph 3 of our decree in the first case, it is liable for only 2-22/31 twelfths (stated in brief of defendant's counsel as 2-2/3 twelfths) of the estimated year's reserves of 100,000,000 cubic feet, which would be 22,580,645 cubic feet. Paragraph 3 of our decree provided:

"That defendant, Big Rapids Gas Company, shall account to plaintiff for all gas used by it between

May 20, 1933, and the date hereof, shall forthwith deliver to plaintiff a verified statement of all natural gas used by it between said dates, and shall immediately make payment to plaintiff at the rate of 15 cents per 1,000 cubic feet for all natural gas used by it between May 20, 1933, and March 22, 1935, *not in excess, however, of the amount of his reserve for such period,* determined as stipulated by paragraph 5 of the contract between the parties."

The decree is clear that defendant's liability for gas it used during the period from January 1, 1935, to March 22, 1935, would not be in excess of its liability for the amount of the estimated reserves for such period. We, therefore, conclude that defendant is obligated to plaintiff for only the estimated gas reserves for such period; that is, 2-22/31 twelfths of 100,000,000 cubic feet, which is 22,580,645 cubic feet, at 15 cents per 1,000.

Defendant asserts another claim of set-off in connection with gas sold by plaintiff after March 22, 1935. It appears from figures stated in the brief of defendant's counsel, which we assume to be correct, that subsequent to March 22, 1935, plaintiff, to mitigate his damages, sold to the American Michigan Pipe Line Company certain quantities of gas under proration order of the Michigan public utilities commission. Defendant contends that 20,100,000 cubic feet of the gas sold by plaintiff after March 22, 1935, under the proration order of the public utilities commission, was applicable to the period from January 1, 1935, to March 22, 1935, and, therefore, defendant is entitled to credit for such amount of gas on its liability to plaintiff accruing prior to March 22, 1935. We find no merit in such claim of set-off, for the reason that the proration order of the public utilities commission only applied to, and provided for, the sale of gas after March 22, 1935.

Defendant, therefore, is not entitled to a set-off or credit as regards such 20,100,000 cubic feet of gas.

Counsel for defendant further contend that under paragraph 1 of the contract defendant is entitled to collect from plaintiff $5,500, to be paid out of one-half of the proceeds of gas sold from the well, and also $1,500 as plaintiff's contribution to the cost of the well. We have examined the contract and also the record in the first case as regards such claims by defendant. Paragraph 1 of the contract required defendant to furnish "all material and labor necessary to drill and complete a gas well upon said acreage." So far as we can determine, defendant did not furnish such material and labor. The record in the first case indicates that the major part of the cost of the well was paid by plaintiff or by John Robinson, his business associate. We conclude that there is no merit to defendant's claims.

We hereby set aside the order of the circuit court entered February 11, 1941, denying plaintiff's petition filed May 10, 1938.

We determine that defendant is indebted to plaintiff for 122,580,645 cubic feet of gas, used by defendant during the period from May 20, 1933, to March 22, 1935, at 15 cents per 1,000 cubic feet; that is, the sum of $18,387.10. Plaintiff shall recover interest at five per cent. on such sum from the date decree is entered herein until such sum is paid.

Decree shall be entered in accordance with this opinion. Plaintiff shall recover costs.

Sharpe, C. J., and Bushnell, Boyles, Chandler, North, Wiest, and Butzel, JJ., concurred.