STARK *v.* BUDWARKER, INC.

1. CONTRACTS—CONDITION SUBSEQUENT—CAUSING CONDITION.

The happening of a condition subsequent does not terminate liability if the promisor unjustifiably causes the condition to occur or the event that does occur was not within the contemplation of the parties so that where a contract for the sale of a liquor license, when the transaction is viewed in its entirety in light of its factual background, provided that if the buyer's motel site is annexed to the City of Midland, which did not permit the sale of liquor by the glass at the time, then the liquor license would be transferred back to the seller and the balance of the purchase price due under the contract would be discharged, did not contemplate that the buyer had an option to avoid paying the unpaid balance by petitioning for and obtaining the annexation of its motel site to the City of Midland.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 17 Am Jur 2d, Contracts §§ 320, 323.
[2-8] 17 Am Jur 2d, Contracts § 240 *et seq.*

2. CONTRACTS—CONSTRUCTION OF CONTRACTS—INTENTION OF PARTIES.
   The cardinal rule in the construction of a contract is to give effect to the intention of the parties.

3. CONTRACTS—CONSTRUCTION OF CONTRACTS—INTENTION OF PARTIES.
   Effect should be given to the intention of the parties rather than to exalt a literal reading of a contract, which is not at all inconsistent with that intention, to a higher status than the understanding and agreement of the parties themselves.

4. CONTRACTS—CONSTRUCTION OF CONTRACTS—JUDGES.
   Judges who attempt to enforce a contract according to their understanding of what is "plain and clear" from a literal reading of the contract run the risk of substituting their own linguistic education and experience for the intent of the parties thereby making for the parties a contract which they did not make.

5. CONTRACTS—CONSTRUCTION OF CONTRACTS—AMBIGUITY—EXTRINSIC FACTS.
   Even where the written documents which represent the contracting parties' agreement are not ambiguous, the circumstances under which the parties contract may be looked at to establish an ambiguity or to indicate the proper choice of possible meanings.

6. CONTRACTS—CONSTRUCTION OF CONTRACTS—INTENTION OF PARTIES —EXTRINSIC FACTS.
   In construing the provisions of a contract due regard must be given to the intentions of the parties as indicated by their language and the attendant facts and circumstances, and such intent, when ascertained, must prevail over the literal meaning of the expressions used in the agreement.

7. CONTRACTS—CONSTRUCTION OF CONTRACTS—INTENTION OF PARTIES.
   In order to give effect to the intention of the parties to a contract for the sale of a liquor license, which provided for the retransfer of the license to the seller and the discharge of the unpaid purchase price in the event the buyer's motel site was annexed to the City of Midland, due regard must be paid to the facts and circumstances surrounding the contract, i.e., that the buyer's motel site was located only a short distance from Midland, that Midland did not permit sale of liquor by the glass at the time, that the buyer needed a liquor license to operate a successful motel/restaurant business, and

that the question of annexation of the motel site to Midland
was of importance to the parties at the time of the contract
because of its impact upon the liquor license.

8. CONTRACTS—CONSTRUCTION OF CONTRACT—INTENT OF PARTIES—
   MEANING OF ANNEXATION.
   In construing the rights and duties of the parties under a writ-
   ten contract which provided for the retransfer of a liquor
   license in the event the buyer's motel site was annexed to
   the City of Midland, which did not permit the sale of liquor
   by the glass, it is apparent that in the context in which the
   parties contracted the word "annexation" means involuntary
   annexation such as would render the liquor license sold un-
   usable by the buyer and the provision was not intended as
   an escape hatch for the buyer in the event he no longer needed
   or desired the liquor license.

Appeal from Midland, Alan C. Miller, J. Sub-
mitted Division 3 March 4, 1970, at Grand Rapids.
(Docket No. 6,489.) Decided July 27, 1970. Leave
to appeal denied October 14, 1970. 384 Mich 764.

Complaint by Harold L. Stark and Martha E.
Stark against Budwarker, Inc., Stewart G. Ball,
Francis E. Warner, Robert B. Whittaker, and Jean
McKay, for a declaration of the rights and liabilities
of the parties to a written contract. Judgment for
defendants. Plaintiffs appeal. Reversed and re-
manded.

*Edward G. Durance,* for plaintiffs.

*Francis & Wetmore,* for defendants.

Before: R. B. BURNS, P. J., and FITZGERALD and
LEVIN, JJ.

LEVIN, J. This is an action for a judgment de-
claring the rights and liabilities of the parties under
a written contract. The plaintiffs appeal a judgment

adopting the defendants' construction of the documents.

The plaintiffs, Harold L. Stark and his wife, Martha, were the owners of the only business in Larkin Township, Midland County, licensed to sell liquor by the glass. Defendant Budwarker, Inc., owned a parcel of land in the same township and desired to construct a Holiday Inn motel.

On February 8, 1966, the Starks sold their business and liquor license to Budwarker for $150,000. Of this amount $44,000 was paid at the closing and the balance was payable over a ten-year period.

The Budwarker property was located only a short distance from the City of Midland where, by local option, liquor could not be sold by the glass. The contract of sale provided that in the event the motel site was annexed to Midland, upon retransfer back to the Starks of the liquor license the unpaid balance of purchase price would be deemed discharged.

In November, 1966 sale of liquor by the glass in Midland was authorized by popular vote and liquor licenses became available. At approximately the same time Budwarker was experiencing water and sewage problems. The City of Midland was willing to supply water and sewage services if the motel site was annexed to the city. In the spring of 1967 Budwarker signed a contract with the city for the use of water and sewage facilities and petitioned for annexation. The Starks were notified of the proposed annexation and of Budwarker's intention to retransfer the liquor license back to them in discharge of the unpaid purchase price.

Budwarker maintains that under the contract, upon annexation of the motel site to the City of Midland and reassignment of the liquor license to the Starks, it would be relieved of the obligation to pay the balance of the purchase price without

regard to whether the annexation was instigated by Budwarker and also without regard to whether annexation affects the usability of the liquor license. The Starks contend that the parties intended that Budwarker would be relieved of its obligation only in the event of an involuntary annexation rendering the liquor license unusable.

The purchase agreement between the parties, dated April 2, 1965, provided that, "in the event there is any change in the governmental status of the property wherein the Holiday Inn motel site is located, from the township of Larkin to the City of Midland" that the liquor license would be transferred back to the Starks subject to Budwarker's right to retain the license by paying the balance due under the agreement.

The understanding of the parties was spelled out more fully at the time of closing, February 8, 1966. The $106,000 balance of the purchase price remaining unpaid after the downpayment is evidenced by two notes. (The individual defendants endorsed the notes.) The closing agreement provided that one note, for $21,500, "shall be paid by Budwarker, Inc., in any event regardless of any disposition that might be made by Budwarker, Inc. of the so-called liquor licenses * * * . That is to say, that *said note shall be paid in full,* according to the terms thereof, *regardless of whether or not Budwarker Inc. shall remain as a licensee of the Michigan Control Commission.* The obligations of said note shall be construed to be absolute, and not subject to any condition precedent, concurrent or subsequent." (Emphasis supplied.)

The closing agreement further provided that the other note, for $84,500, was "conditioned upon the following: It is understood that Budwarker intends to use said liquor license in connection with its

operation of a motel, commonly referred to as the Holiday Inn motel, to be constructed by Budwarker, and operated on certain premises in the Township of Larkin  *   *   *  . *In the event that said motel site is hereafter annexed to the City of Midland, then it is understood that Budwarker shall use its best efforts to secure a retransfer and reconveyance of all such liquor licenses to the said Harold L. Stark and Martha E. Stark,*  *   *   *  . All sums remaining due and unpaid, following the date of such retransfer and reconveyance  *   *   *  shall be discharged, and the said promissory note shall be returned by the holder thereof, to Budwarker, Inc." (Emphasis supplied.)

The plaintiffs commenced this action seeking a declaration of rights on June 8, 1967. The defendants filed a motion for summary judgment which was denied by the Midland county circuit judge.[1] The case was subsequently tried before a visiting judge without a jury. On October 21, 1968 judgment was entered in favor of the defendants.

The essential facts are not in dispute. At the time the contract was made liquor could not be sold by the glass in Midland. Both parties believed that annexation of the Budwarker property to Midland would render the Starks' liquor license unusable. The principal purpose of the annexation provision was to protect Budwarker in the event the license became unusable by reason of annexation. The trial judge found:

"This economic factor, the value of the license, outweighed the problem of having to set up a water and sewer system and other self-help remedies that

---

[1] He ruled that "in order to ascertain the intent of the parties, the contracts in question must be construed in the light of the circumstances which existed at the time the contracts were made" and that it would be necessary to take testimony to determine the circumstances.

one has to put up with when he is in a rural area, rather than in a municipality. The instruments were therefore prepared contemplating that there might sometime be an annexation; contemplating that the liquor license would then lose some of its value or be entirely lost and have to be retransferred;"[2]

He also found that the vote authorizing the sale of liquor by the glass came as a surprise to both parties. And that when this occurred and liquor licenses became available, the liquor license purchased from the Starks became worth far less than before and Budwarker simply availed itself of an option which it "literally" had under the agreement to retransfer the license to the Starks, thereby relieving itself of the obligation to pay the balance of the $84,500 note. He observed that "the agreement is literally drawn in such a way" as to allow Budwarker to petition for annexation and, if that is achieved, to retransfer the license and avoid paying the unpaid balance.

In reaching his conclusion, the judge considered the testimony of the parties. This is not a case where relevant testimony was excluded under the parol evidence rule.[3] In the judge's opinion, however, the critical factor was the literal wording of the agreement. He declared that the surprise vote did not give him a basis "to redraft the document in the light of what might have been said if they

---

[2] The judge also found that the possibility that annexation might become necessary to obtain city water and sewer service was not the factor which motivated the inclusion of the provision regarding annexation.

[3] Parol evidence is admissible to show any meaning which is not "impossible." Restatement of Contracts, § 242 (see footnote 11).

Michigan cases supporting this rule include *New Amsterdam Casualty Company* v. *Sokolowski* (1965), 374 Mich 340; *Magee* v. *Brown* (1957), 347 Mich 638; *Keller* v. *Paulos Land Company* (1968), 381 Mich 355; *Brown* v. *A. F. Bartlett & Co.* (1918), 201 Mich 268; *In re Traub Estate* (1958), 354 Mich 263.

thought and talked and fully anticipated it in the inception."

We take a different view of the documents. We do not think they can properly be read as conferring upon Budwarker an option to retransfer even if it did not face loss of the license because of annexation.

The closing agreement permitted retransfer of the liquor license in discharge of the $84,500 note "in the event that said motel site is hereafter annexed to the City of Midland"; and provided that the $21,500 note was to be paid "regardless of whether or not Budwarker, Inc. shall remain as a licensee of the Michigan Control Commission." Reading these two clauses of the closing agreement together and the contract as a whole,[4] a retransfer[5] relieving Budwarker of liability to pay the unpaid balance of the $84,500 note was permitted in the event of an annexation resulting in Budwarker ceasing to "remain as a licensee," i.e., annexation affecting the continued usability of the license. Nothing in the documents, none of the testimony, supports the view that the parties agreed to give Budwarker the right to avoid its obligation to pay the purchase price even if annexation did not affect the usability of the license

---

[4] "A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together." Restatement of the Law Second, Contracts, Tentative Draft No. 5, § 228(2), p 68.

"Meaning is inevitably dependent on context. A word changes meaning when it becomes part of a sentence, the sentence when it becomes part of a paragraph. A longer writing similarly affects the paragraph, other related writings affect the particular writing, and the circumstances affect the whole." Restatement of the Law Second, Contracts, Tentative Draft No. 5, § 228(2), comment d, pp 72, 73.

"The meaning of any particular part of an instrument can only be found by an examination of the whole." Staebler-Kempf Oil Company v. Mac's Auto Mart, Inc. (1951), 329 Mich 351, 356. Similarly, see Klever v. Klever (1952), 333 Mich 179, 186; Associated Truck Lines, Inc. v. Baer (1956), 346 Mich 106, 112.

[5] See MacNicol v. Grant (1953), 337 Mich 309, 315, regarding the licensee's interest in the license.

or that Budwarker was authorized to create the situation which would trigger a right of transfer.

A corollary of the principle that when liability under a contract depends upon the performance or happening of a condition the promisor cannot avoid liability by preventing the condition from happening,[6] is the principle that the happening of a condition subsequent does not terminate liability if the promisor unjustifiably causes the condition to occur or the event that does occur was not within the contemplation of the parties.[7] The record in this case would not substantiate a finding that both parties contemplated that Budwarker was empowered to petition for annexation as a means of relieving itself of its obligations under the contract should it decide it no longer needed the Starks' license.

The cardinal rule of construction is that we seek to determine and to give effect to the intention of the parties.[8] In this case there is no dispute as to what the parties had in mind. Both Budwarker's and the Starks' witnesses are in entire agreement that the principal purpose of the pertinent language was to protect Budwarker in the event it lost the use of the license as the result of annexation.

"Words and other conduct are interpreted in the light of all the circumstances, and *if the principal purpose of the parties is ascertainable it is given great weight."* Restatement of the Law Second, Contracts, Tentative Draft No. 5, § 228(1), p 68. (Emphasis supplied.)

---

[6] 5 Williston on Contracts, § 677, p 224, *et seq.;* 3 Corbin on Contracts, §§ 570, 571, p 341, *et seq.*

[7] Restatement of the Law, Contracts, § 307.

*Cf.* Restatement of the Law Second, Contracts, Tentative Draft No. 5, § 231, p 92: "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."

[8] *McIntosh* v. *Groomes* (1924), 227 Mich 215, 218; *Teachout* v. *Maiers* (1965), 2 Mich App 69.

"Determination that the parties have a principal purpose in common requires interpretation, but if such a purpose is disclosed further interpretation is guided by it. Even language which is otherwise explicit may be read with a modification needed to make it consistent with such a purpose." Restatement of the Law Second, Contracts, Tentative Draft No. 5, comment c, p 71.

If we can give effect to the intention of the parties—and we can—we should do so rather than exalt a "literal" reading, one not at all inconsistent with that intention, to a higher status than the understanding and agreement of the parties themselves.

Professor Corbin warns that when judges attempt to enforce a contract according to their understanding of what is "plain and clear" they run the risk of substituting their own linguistic education and experience for the intent of the parties thereby " 'making a contract for the parties,' one which they did not make."[9]

Reading the closing agreement as a whole in the light of the extrinsic fact[10] that Midland was dry and the property was located a short distance from Midland, it is apparent that the parties regarded

---

[9] "The primary and ultimate purpose of the interpretation is to determine and make effective the *intention of the contracting parties.* (Emphasis by the author.) * * *

"No party to a contract should ever be bound by an interpretation that is determined exclusively by the linguistic education and experience of the judge. * * *

"When a court enforces a contract in accordance with an interpretation that seems 'plain and clear' to the court and excludes relevant convincing evidence that the parties intended a different interpretation, it is 'making a contract for the parties', one that they did not make.

"No word or group of words in any language has an 'objective' meaning separate from and independent of its actual use by some person to convey his thought to another person." 3 Corbin on Contracts, 1964 PP, § 572B.

[10] See *McCarty* v. *Mercury Metalcraft Company* (1964), 372 Mich 567, 575.

annexation of importance because of its impact upon the liquor license.

"And even where the writing is not ambiguous on its face, the circumstances under which the parties contract may be looked at to establish an ambiguity, as well as to indicate the proper choice of possible meanings; and the common knowledge and the understanding of the parties themselves as shown by their previous negotiations is sometimes such a circumstance." Restatement of Contracts, § 242, comment a, p 341.[11]

At the time the parties contracted, liquor could not be sold by the glass in the city of Midland and neither party thought there was prospect of a change in that restriction. Budwarker needed a liquor license to operate a successful motel/restaurant business. The parties contracted against that factual background; it does not appear to have occurred to either the Starks or Budwarker that Budwarker might voluntarily seek annexation.[12]

"In construing [the] provisions [of a contract] due regard must be had to the purpose sought to be accomplished by the parties as indicated by the language used, read in the light of the attendant facts and circumstances. Such intent when ascertained must, if possible, be given effect and must prevail as against the literal meaning of expressions used in the agreement." *W. O. Barnes Company, Inc.* v. *Folsinski* (1953), 337 Mich 370, 376, 377.[13]

---

[11] The blackletter of § 242 provides that previous negotiations are permissible to show "that the agreement has any meaning which is not impossible under the standards stated in § 230, though that meaning would not otherwise have been given to the agreement." The reference to § 230 would appear to preclude use of parol evidence under § 242 to attach a meaning which no reasonably intelligent, fully-informed person would place thereon.

[12] See *W. O. Barnes Company, Inc.* v. *Folsinski* (1953), 337 Mich 370, 377, 378.

[13] Other Michigan cases supporting the rule that the surrounding circumstances may be shown to explain the context in which the words were used and their meaning include *Moulton* v. *Lobdell-*

The Starks, indeed, did not have an unconditional promise of payment. As Budwarker argues, the Starks gambled. But the gamble concerned the possibility of involuntary annexation and a loss of the continued right to use the liquor license, which it was anticipated would result in such event, not that Budwarker would no longer need or want the license.[14]

Budwarker seeks to turn the language in question into an option to terminate whenever it chose to bring about annexation. It is not claimed, however, that Budwarker bargained for, or that the Starks agreed to confer upon Budwarker, such an option to avoid paying the unpaid balance of the purchase price at its will. The annexation provision was not included in the contract to provide Budwarker with an escape hatch to be availed of in the event it no longer needed or desired the Starks' liquor license.

In the context in which the parties contracted, annexation means involuntary annexation rendering the Starks' liquor license unusable by Budwarker.

---

*Emery Manufacturing Company* (1948), 322 Mich 307; *MacNicol v. Grant, supra; Piasecki* v. *Fidelity Corporation of Michigan* (1954), 339 Mich 328, 337; *Borden* v. *Fletcher's Estate* (1902), 131 Mich 220, 232, 233; *Montgomery* v. *Central National Bank & Trust Company of Battle Creek* (1934), 267 Mich 142, 145; *Nelson* v. *Big Rapids Gas Co.* (1941), 299 Mich 284, 294; *Sobczak* v. *Kotwicki* (1956), 347 Mich 242, 249.

"The meaning of words and other symbols commonly depends on their context; the meaning of other conduct is even more dependent on the circumstances. In interpreting the words and conduct of the parties to a contract, a court seeks to put itself in the position· they occupied at the time the contract was made." Restatement of the Law Second, Contracts, Tentative Draft No. 5, comment b, p 69.

[14] Suppose that Budwarker violated the liquor law and the license was suspended for a lengthy period of time. Or that Budwarker had a change of heart and decided not to build the motel or converted it into a nursing home or to close it down because it did not prove successful, or it had burned down. Under the construction of the contract which Budwarker would have us adopt, but which we reject, it could avoid paying the balance of the purchase price if it could bring about annexation of the property to Midland even though it is manifest that Budwarker never bargained for, that the Starks did not contemplate, conferring upon Budwarker such a right of cancellation.

Reversed and remanded for appropriate modification of the judgment to declare the rights of the parties in a manner consistent with this opinion. Costs to plaintiffs.

All concurred.